IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 19, 2023 Session

## CASSANDRA BURKS v. GREGORY B. BURKS

**Appeal from the Chancery Court of Hamilton County**
**No. 18-0056        Don R. Ash, Senior Judge**

———————————————————

**No. E2022-00776-COA-R3-CV**

———————————————————

This is a divorce proceeding in which the wife filed a divorce complaint against the husband on the grounds of adultery and inappropriate marital conduct. While the action was pending, Husband drafted a handwritten reconciliation document in which he promised that the marital residence would become the wife's separate property if he ever "cheated" on her again, "in consideration of her reconciling with [him] (also dropping the divorce lawsuit currently filed)." Although the wife took no action to "drop" or dismiss the divorce complaint, the trial court, sua sponte, dismissed the complaint for failure to prosecute. Upon learning that the husband's infidelity had resumed, the wife successfully motioned to set aside the order of dismissal, and the case went to trial. In its final order, the trial court granted the wife a divorce on grounds of inappropriate marital conduct due to the husband's infidelity. Because the wife took no action to enforce the purported reconciliation agreement, the court classified the marital residence as marital property, not the wife's separate property. The court awarded the wife approximately $3.9 million in marital assets, of which $1.3 million was liquid assets, representing 60% of the marital estate. The court further awarded the wife $13,000 per month in transitional alimony for eight years and $229,000 in alimony in solido, but declined to award her alimony in futuro. The court also denied the wife's request to recover her attorney's fees and expenses. The wife appeals, contending that the trial court erred in failing to classify the marital residence as her separate property and in failing to award her alimony in futuro as well as her attorney's fees. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

FRANK G. CLEMENT, JR., P.J., M.S., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and JOHN W. MCCLARTY, J., joined.

Larry Hayes, Jr., Rachel M. Thomas, Nashville, Tennessee, for the appellant, Cassandra Burks.

Glenna M. Ramer, Christina Renee Mincy, Chattanooga, Tennessee, for the appellee, Gregory B. Burks.

**OPINION**

**FACTS AND PROCEDURAL HISTORY**

Gregory Burks ("Husband") and Cassandra Burks ("Wife") were married in October 1995 and had three children together.[1] Early in their marriage, both spouses worked outside of the home. Wife, who has a bachelor's degree, worked as a database investigator for Unum Insurance, where she earned between $20,000 and $45,000 a year. In 2001, Wife stopped working outside of the home in order to raise the parties' children. Husband worked as a personal injury attorney, and as his career blossomed, his earnings increased dramatically.[2] His average income from his law practice for the four years prior to the divorce was $1.68 million a year, or $140,000 a month. Thus, the parties enjoyed a very comfortable lifestyle with all three children attending private schools and Husband and Wife being members of two country clubs in the Chattanooga area.

In January 2018, Wife filed a complaint for divorce in the Hamilton County Chancery Court. Wife requested, inter alia, an equitable division of the marital estate, child support and awards "of temporary support, periodic alimony [a.k.a., alimony in futuro] and attorney's fees."

Wife's complaint lay dormant for a period of nearly two years while the couple attempted to reconcile. During this period, the parties sought the assistance of marriage therapist, Dr. James Brown. Acting upon a suggestion by Dr. Brown, on August 17, 2018, Husband drafted and gave Wife a handwritten document in an effort to salvage the marriage. The document stated that Husband agreed to give up his interest in the marital residence if he was unfaithful again "in consideration of [Wife] reconciling" with him and "dropping the divorce lawsuit." Specifically, the document reads:

8-17-18

To Whom it May Concern;

---

[1] At the time of the divorce trial, two of the parties' three children were minors. The court approved an agreed-upon permanent parenting plan, which is not at issue in this appeal.

[2] In 1998, Husband started his legal career with a Chattanooga personal injury attorney, John D. McMahan. In 2006, Husband and James R. Kennamer purchased the firm, then known as McMahan Law Firm, P.C., after which they became the sole shareholders.

It being [my] sole desire to reconcile my marriage with Cassandra and in consideration of her reconciling with me (also dropping the divorce lawsuit currently filed); I agree that if I cheat on her at anytime in the future, I will give up my interest in our marital residence at 1108 Cumberland Road. In other words, that residence would then become her separate property.

Any dispute about what constitutes cheating will be determined by a Court of law.

If Cassandra chooses to divorce me for any other reason other than my future infidelity, this agreement/contract does not come into effect/apply.

[signature]
G. Brent Burks

Thereafter, the parties engaged in a quasi-marital relationship during which Husband primarily resided in a second home but occasionally stayed with Wife at the marital residence.

Although Wife did not take affirmative action to "drop" or dismiss the divorce complaint, the trial court, sua sponte, dismissed the divorce action for failure to prosecute on November 11, 2019.

In December 2019, Wife learned that Husband was seeing another woman. Shortly thereafter, in January 2020, Wife filed a motion to set aside the order of dismissal and reinstate her complaint for divorce, and the case was reinstated by agreed order filed on January 15, 2020.

After a contentious discovery period, the case was tried over two days on March 2 and 3, 2022, during which the trial court heard testimony from Wife, Husband, and multiple other witnesses. On March 3, 2022, the trial court announced its decision from the bench, a transcript of which was incorporated in its final divorce decree entered May 11, 2022.

The trial court granted Wife an absolute divorce on the grounds of inappropriate marital conduct due to Husband's infidelity. The trial court also adopted the parties' agreed parenting plan, which called for Husband to pay $3,200 per month in child support as well as the children's private school tuition.

Regarding the reconciliation agreement, the court found that when Husband presented the writing to Wife during marital counseling, Wife stated that she was "going to take it home and think about it," but that she never signed it. The court also found that Wife never acted upon the writing. Specifically, the court found that Wife did not voluntarily dismiss her divorce complaint, but that the complaint was dismissed by the trial court for failure to prosecute. Moreover, the court noted that, if Wife believed the home to be her separate property, she would have "started paying the house payment, the

- 3 -

landscaping payment, all those things" after the divorce action was reinstated, which she did not do. For these and other reasons, the court held that the marital residence was marital property, not Wife's separate property.

After considering the equitable factors enumerated in Tennessee Code Annotated 36-4-121(c), the court divided the marital estate 60/40 in favor of Wife. The court awarded Wife the marital residence on Elder Mountain, which it valued at $2 million; the furnishings in the Elder Mountain home, which it valued at $200,000; a 2019 Mercedes E450 vehicle, valued at $80,000; a coin collection, which it valued at $9,000; a Fidelity investment account, valued at $2,019; half of a Regions Bank checking account, valued at $178,606; half of a Regions Bank savings account, valued at approximately $1 million; half of a Raymond James retirement account, valued at $780,274; and all of her retirement account with Unum, valued at $61,831, as well as $187,000 in the IOLTA account of Wife's counsel. In total, the trial court valued the marital property awarded to Mother at $3,921,593.[3]

The court awarded Husband property valued at approximately $3,518,070, which included half of the accounts referenced above; a residential property on Magnolia Vale Drive, which it valued at $50,000; a 2015 Mercedes GL 450 vehicle, which it valued at $18,900; a Chaparral boat, which it valued at $30,000; the country club memberships, which it valued at $20,000; Husband's half interest in the McMahan Law Firm, which it valued at $1.8 million; and other miscellaneous assets.

The bulk of the marital debts were assessed against Husband. Specifically, Husband was held solely responsible for the Fifth Third Bank mortgage on the marital residence in the amount of $430,525, the CapStar debt of $700,000, and all obligations owed by the McMahan Law Firm. The trial court valued the total debt allocated to Husband at $959,874. Each party was assigned the responsibility to pay their respective credit card debts.

Turning to spousal support, the court considered and made specific factual findings regarding the equitable factors enumerated in Tennessee Code Annotated 36-5-12(i)(1)–(12). Considering these factors, and particularly Husband's ability to pay and Wife's need, the trial court denied Wife's request for alimony in futuro[4] and instead awarded her

---

[3] In its final decree, the trial court valued the marital property as listed above. We note that Husband's calculations state that the trial court valued the total marital property awarded to him at $3,293,943, and that it valued the property awarded to Wife at $4,135,438. Husband also states that the total debt allocated to him as valued by the trial court was $959,874.00, which is consistent with the final order. Wife's calculations of the trial court's valuations of the marital property and marital debts awarded to each party are consistent with the values assigned by the trial court in the final order.

[4] Wife requested $25,000 per month in futuro to cover her expenses, which included $1,000 per month for "home décor," $2,300 per month for "vacations," and $2,000 per month for her clothing. Husband suggested transitional alimony for a period of eight years.

transitional alimony in the amount of $13,000 per month for eight years[5] and alimony in solido in the amount of $229,000. The court noted that transitional alimony is "used when rehabilitation is not necessary but one party needs assistance due to the economic consequences of a divorce." On the other hand, the court stated that alimony in futuro "is designed to continue the support that was incident to the marriage relationship and is appropriate when the spouse cannot be rehabilitated." The court also noted that "[r]ehabilitated means to achieve, with reasonable effort, a comparable standard of living to that during the marriage or which the other spouse would enjoy after divorce." Based on these legal principles and other factors, the trial court reasoned that transitional alimony was appropriate in this case because Wife could work outside the home and there was "no amount of money" that would "keep her in the standard of living that she ha[d] grown used to."

Considering the sizable awards of cash and other assets to each party, the court held that each party would be responsible for his or her own attorney's fees. Nevertheless, it directed the trial attorneys to file affidavits for the appellate record.

Thereafter, Husband timely filed a motion to alter or amend the judgment to (1) reduce his monthly mortgage payment by $1,500 per month to account for the cost of property insurance and taxes paid with the mortgage; (2) adjust the awards of marital property to reflect a 50/50 division of the estate; and (3) award him the couple's 2021 income tax refund to help satisfy his obligations.[6]

In August 2022, the trial court heard the motion to alter or amend. In its order of October 14, 2022, the court granted Husband's request to allocate the property taxes and insurance to Wife and awarded Husband two-thirds of the tax refund. The trial court denied Husband's request that the court modify the awards of marital property to reflect a 50/50 division, stating that it had "considered all of the elements required by statute in dividing the marital property."

This appeal followed.

---

[5] This constitutes an award of $1,248,000 because the court specified that it was not modifiable and that the award survived Husband's death. The final decree reads in pertinent part, "Husband's transitional alimony obligation shall not terminate upon Husband's death and must still be paid in full if Husband is deceased. Wife shall have a claim against Husband's estate for any remaining transitional alimony."

[6] Husband also asked that the trial court reduce Wife's award of alimony in solido to account for certain credit card charges on Husband's account attributable to Wife. Husband subsequently withdrew this request. Additionally, Husband asked the court to modify its ruling to "reflect the amount of Mrs. Burks' attorney fees and expenses that were paid from the [parties'] joint account." Wife responded by filing her own motion to alter or amend the judgment to include her attorney's fees and expert fees in the award of alimony in solido. Husband subsequently withdrew this request.

**ISSUES**

Wife presents four issues on appeal. Husband presents no additional issues. We rephrase Wife's issues as follows:

    I.     Whether the trial court erred in not finding the existence of a unilateral contract and enforcing it.

    II.    Whether the trial court erred in the type, duration, and amount of alimony awarded to Wife.

    III.    Whether Wife is entitled to her attorney's fees at trial.

    IV.    Whether Wife is entitled to her attorney's fees on appeal.

**STANDARD OF REVIEW**

This court reviews findings of fact made by a trial court sitting without a jury under a de novo standard accompanied by a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d) (2005). The trial court's conclusions of law are reviewed de novo with no presumption of correctness. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993) (citation omitted).

**ANALYSIS**

I. THE MARITAL RESIDENCE

We begin by addressing Wife's argument that, based on the purported reconciliation agreement, the parties' former marital residence, located on Elder Mountain, should be classified as her separate property.

The trial court's final decree states, in pertinent part:

7. Wife argued at trial that the Elder Mountain Home was her separate property due to a document signed saying that if Husband strayed outside of the marriage that Wife could have the house. The Court finds that it was unrefuted that Wife told Husband she was not going to sign the document yet, and that the document is, indeed, unsigned by Wife. The Court also finds that if the parties were going to let the terms of this document govern, then once the divorce was reinstated that Wife should have started paying the house payment, the landscaping payment, and all of those other expenses. Wife did not do that. The Court also notes that there was some issue about whether the divorce was actually dismissed based upon action by Wife. In fact, it was dismissed for failure to prosecute.

(Internal citations to the record omitted).

Based on these findings, the trial court held that "the house is not separate property and that the Court has the obligation to divide it."

On appeal, Wife contends that this finding was in error, claiming that the writing at issue is a "textbook unilateral contract" and that she rendered performance as acceptance of Husband's promise by "discontinuing pursuing her divorce action against [Husband] and allowing same to be dismissed" and doing "everything [she] could do to reconcile with him."

Husband contends, inter alia, that Wife did not take the actions required by the purported unilateral agreement to make it an enforceable contract. Husband insists that Wife took no affirmative action to dismiss the complaint for divorce and that she never reconciled with him. He also notes that she never signed the document and that she never acknowledged that she consented to the terms of the purported agreement, saying only that she would "think about it." Additionally, Husband notes that, after Wife learned of his subsequent infidelity, she did not pay the mortgage on the home, the property taxes, or other related expenses, and thus did not act as though she was the sole owner of the property. For these reasons, Husband contends that the "writing" never became an enforceable contract.

Whether a contract has been formed is a question of law, *German v. Ford*, 300 S.W.3d 692, 701 (Tenn. Ct. App. 2009) (citation omitted), which we review de novo with no presumption of correctness. *Union Carbide Corp.*, 854 S.W.2d at 91 (Tenn. 1993).

"Reconciliation agreements are contracts and should be construed using the rules of construction generally applicable to contracts." *Batson v. Batson*, 769 S.W.2d 849, 854 (Tenn. Ct. App. 1988) (citation omitted). The essential elements of a unilateral contract are an offer that calls for acceptance **by performance of an act**, rather than by a return promise, and performance by the offeree of **all of the required acts**. *Johnson v. Metro. Gov't of Nashville*, No. M2001-00633-COA-R3CV, 2002 WL 31769125, at *4 (Tenn. Ct. App. Dec. 11, 2002) (emphasis added) (citations omitted).

As previously mentioned, Husband made the following offer:

> [I]n consideration of [Wife] reconciling with me (also dropping the divorce lawsuit currently filed); I agree that if I cheat on [Wife] at anytime in the future, I will give up my interest in our marital residence.

We find that the writing at issue contains the components of what could become an enforceable unilateral contract. In order to accept Husband's offer and effectuate the

unilateral contract, Wife did not need to sign the writing but was instead required to perform the acts specified in the writing.

Husband's offer required that Wife take two separate actions. First, it required that Wife reconcile with Husband, and it is disputed whether the parties reconciled. Second, the writing required that Wife "drop[] the divorce lawsuit currently filed." As the trial court correctly found, Wife did not affirmatively "drop" the lawsuit. To be fair, Wife did not actively prosecute the case while the parties were attempting to reconcile, which is evident from the trial court's sua sponte dismissal of the complaint for failure to prosecute. However, Wife's failure to pursue the divorce during this period was not equivalent to her taking the initiative of "dropping the divorce lawsuit." *Woodruff v. Nat'l Life Ins. Co.*, No. E2008-00605-COA-R3-CV, 2009 WL 792824, at *5 (Tenn. Ct. App. Mar. 26, 2009) ("With respect to a unilateral or option contract, it is a well-established and uniform rule that the acceptance of an offer must exactly and precisely accord with the terms of the offer") (citation omitted). Furthermore, as the trial court correctly noted, after the divorce action was reinstated, Wife generally took no action indicative of one who is claiming exclusive ownership of real property, such as paying the mortgage, the taxes, or the operating expenses on the home.

For these reasons, we affirm the trial court's findings on this issue and hold that the parties' marital residence was marital property.

## II. ALIMONY

Wife contends that the trial court abused its discretion in awarding her transitional alimony, rather than alimony in futuro. Wife claims that, without an award of alimony in futuro, she "cannot ever be rehabilitated" to the high standard of living that the parties enjoyed during the marriage[7] as she has not worked outside of the home in over twenty years and has an earning capacity that is significantly lower than Husband's.[8] She asks this court to award her "alimony in futuro in whatever amount it deems reasonable in excess of $13,000 per month until her death or remarriage, or until Husband's death, whichever is first to occur."

Husband contends that the trial court considered the relevant statutory factors in determining Wife's alimony award, for which it made specific findings of fact, and that the evidence preponderates in favor of those findings. He further notes, based on the division of marital assets and debts, that "Wife will have little to pay—and, the payments will be

---

[7] Wife's Expense Statement showed approximately $42,000 per month in expenses, commensurate with the marital standard of living, however, she requested $25,000 per month in alimony.

[8] Wife notes that, when she worked outside of the home, she earned between $20,000 to $45,000 per year. By contrast, Husband earned $1.69 million a year on average for the past four years.

covered by her alimony of $13,000 per month and her child support of $3,200 per month." Conversely, he notes that he will have to pay "$13,000 alimony, a mortgage balance of $430,000, maximum child support, private school tuition, and all school related expenses" along with alimony in solido of $229,000. Based on these and other factors, Husband contends that the decision to award transitional alimony of $13,000 a month for eight years instead of alimony in futuro did not constitute an abuse of the trial court's broad discretion.

Trial courts are afforded wide discretion in determining whether there is a need for spousal support, and if so, the nature, amount, and duration of the award. *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011). Appellate courts will decline to second-guess a trial court's decision absent an abuse of discretion. *Id.* (citation omitted).

A court may award "rehabilitative alimony, alimony in futuro, also known as periodic alimony, transitional alimony, or alimony in solido, also known as lump sum alimony or a combination of these." *Bottorff v. Bottorff*, No. M2007-01792-COA-R3-CV, 2008 WL 2901619, at *3 (Tenn. Ct. App. July 21, 2008) (quoting Tenn. Code Ann. § 36-5-121(d)(1)). Long term alimony in the form of alimony in futuro is appropriate if the court finds that

> there is relative economic disadvantage and that rehabilitation is not feasible, meaning that the disadvantaged spouse is unable to achieve, with reasonable effort, an earning capacity that will permit the spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage[.]

Tenn. Code Ann. § 36-5-121(f)(1). However, our state Supreme Court has noted that "[t]he prior concept of alimony as lifelong support enabling the disadvantaged spouse to maintain the standard of living established during the marriage has been superseded by the legislature's establishment of a preference for rehabilitative alimony." *Robertson v. Robertson*, 76 S.W.3d 337, 340–41 (Tenn. 2002) (citations omitted). Moreover, "The parties' incomes and assets will not always be sufficient for them to achieve the same standard of living after divorce that they enjoyed during the marriage." *Id.* (citing *Crabtree v. Crabtree*, 16 S.W.3d at 359–60 (Tenn. 2000)).

Transitional alimony, on the other hand, "is designed to aid a spouse who already possesses the capacity for self-sufficiency but needs financial assistance in adjusting to the economic consequences of establishing and maintaining a household without the benefit of the other spouse's income." *Mayfield v. Mayfield*, 395 S.W.3d 108, 115 (Tenn. 2012) (quoting *Gonsewski*, 350 S.W.3d at 109)).

In determining whether to award spousal support, along with the nature, amount, and duration of the award, the court "shall consider all relevant factors" enumerated in Tennessee Code Annotated § 36-5-121(i). Those factors are as follows:

(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;

(3) The duration of the marriage;

(4) The age and mental condition of each party;

(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7) The separate assets of each party, both real and personal, tangible and intangible;

(8) The provisions made with regard to the marital property, as defined in § 36-4-121;

(9) The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so;

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-121(i)(1)–(12). The two most important factors are the need of the disadvantaged spouse and the obligor spouse's ability to pay. *Buntin v. Buntin*, 673 S.W.3d 593, 606 (Tenn. Ct. App. 2023) (quoting *Watson v. Watson*, 309 S.W.3d 483, 497–98 (Tenn. Ct. App. 2009)). When considering these two factors, the primary consideration

is the disadvantaged spouse's need. *Van Zandbergen v. Van Zandbergen*, No. M2022-00886-COA-R3-CV, 2023 WL 7483499, at \*4 (Tenn. Ct. App. Nov. 13, 2023) (quoting *Murdock v. Murdock*, No. W2019-00979-COA-R3-CV, 2022 WL 611024, at \*14 (Tenn. Ct. App. Mar. 2, 2022)).

In the present case, the trial court considered the above statutory factors, particularly Wife's need as the disadvantaged spouse and Husband's ability to pay, and set out specific findings of fact in regard to each relevant factor.[9] The court found that, although Husband has the greater earning capacity, Wife is "getting $2.2 million, a little bit more than that in hard assets" and "$1.6 million in cash or close to cash," stating that "with that kind of cash and having a house with no payment, she should easily maintain her lifestyle." The court also noted that there is "no amount of money that it can give Wife that will keep her in the standard of living that she has grown used to, unless Husband has nothing or very limited assets especially since his income goes up and down." The court also found that Wife, who was 53 years old at the time of trial, was in good health and capable of working outside of the home, if she wants to, because she has a college degree and is "a very articulate, very smart lady, and it seems that there could be something there [meaning employment] if she wanted to make that choice." Based on these and other statutory factors considered by the trial court, the court declined to award Wife alimony in futuro, instead awarding her $13,000 per month in transitional alimony for eight years, along with an award of $229,000 of alimony in solido.

Upon careful review of the record, we hold that the evidence does not preponderate against the trial court's findings. While it is true that Husband has a substantial earning capacity, Wife has been awarded 60% of the sizeable marital estate, valued at $3.9 million of which "$1.6 million [is] cash or close to cash." Moreover, Husband will be responsible for paying the mortgage balance of $430,000 at $6,109 per month, maximum child support of $3,200 per month, private school tuition for the children,[10] all school related expenses, transitional alimony of $13,000 per month, and alimony in solido of $229,000.

Having considered the entire record, we are unable to conclude that the trial court abused its discretion in its decision to award Wife transitional alimony of $13,000 a month for eight years rather than alimony in futuro in a greater amount. Accordingly, we affirm the trial court on this issue.

---

[9] In its memorandum opinion, the trial court made findings as to the relative earning capacities and education of the parties, the long-term nature of the marriage, the age and mental condition of the parties, the physical condition of the parties, the parties' ability to seek employment outside of the home, the distribution of the marital property, the parties' standard of living during the marriage, the parties' contributions to the marriage, and the relative fault of the parties.

[10] The parties' middle child was currently attending Baylor School in Chattanooga, and the cost was approximately $28,000 per year.

## III. ATTORNEY'S FEES AT TRIAL

Wife contends that the trial court abused its discretion in declining to award her attorney's fees at trial. Her argument is based on four principles. One, in deciding whether to award fees as alimony in solido, "an award of attorney's fees is appropriate 'when the spouse seeking them lacks sufficient funds to pay his or her own legal expenses, or the spouse would be required to deplete his or her own resources to pay them.'" *Olinger v. Olinger*, 585 S.W.3d 919, 921–22 (Tenn. Ct. App. 2019) (quoting *Gonsewski*, 350 S.W.3d at 113)). Two, she relies on Tennessee Code Annotated § 36-5-121(h)(1)(B), which became effective on March 31, 2022, and mandates that, in awarding alimony in solido, courts "shall" consider the alimony factors, the total amount of attorney's fees incurred by each party, and whether the fees were reasonable and necessary. Three, that "fault" for the demise of the marriage should be considered in an assessment and award of attorney's fees. *See Gilliam v. Gilliam*, 776 S.W.2d 81, 86 (Tenn. Ct. App. 1988). Four, in awarding alimony in solido, courts should consider why a party had to incur the amount of attorney's fees that he or she incurred. *See Id.* at 86–87.

Husband insists that the trial court did not abuse its discretion in holding each party responsible for his or her own attorney's fees. Furthermore, and more specifically, he notes that the trial court awarded Wife alimony in solido of $229,000 and the IOLTA funds held by her attorney for her benefit in the amount of $187,000. Husband contends that Wife will be able to use these funds to pay her attorney's fees without "ever touching her share of the savings ($1,000,000), her share of the retirement, or checking account[.]" In this regard, Husband relies on the principle that "[a] spouse with adequate property and income is not entitled to an award of alimony to pay attorney's fees and expenses." *Umstot v. Umstot*, 968 S.W.2d 819, 824 (Tenn. Ct. App. 1997) (citation omitted). He also relies on *Waddell v. Waddell*, No. W2020-00220-COA-R3-CV, 2023 WL 2485667, at *51 (Tenn. Ct. App. Mar. 14, 2023), appeal denied (Sept. 12, 2023). In *Waddell*, this court stated:

> Such awards are appropriate only when the spouse seeking them lacks sufficient funds to pay his or her own legal expenses, *see Houghland v. Houghland*, 844 S.W.2d 619, 623 (Tenn. Ct. App. 1992), or the spouse would be required to deplete his or her resources in order to pay them, *see Harwell v. Harwell*, 612 S.W.2d 182, 185 (Tenn. Ct. App. 1980).

In a divorce action, an award of attorney's fees constitutes alimony in solido. *Gonsewski*, 350 S.W.3d at 113 (citations omitted). The decision of whether to award attorney's fees is within the sound discretion of the trial court. *Id.* (citation omitted).

We begin our analysis by noting that Wife's reliance on the most recent version of Tennessee Code Annotated § 36-5-121(h)(1)(A)–(B) is misplaced, for the provision she relies upon, which mandates that the trial court consider the amount of attorney's fees

incurred before ruling on the issue, was not in effect when this divorce complaint was filed in 2018. The version she relies upon became effective March 31, 2022; however, this court has previously held that, in determining an award of attorney's fees, a trial court must apply the version of the statute in effect **when the divorce complaint was filed**. *Gergel v. Gergel*, No. E2020-01534-COA-R3-CV, 2022 WL 1222945, at *45 (Tenn. Ct. App. Apr. 26, 2022) (emphasis added) (Finding that the trial court in that case erred in applying a version of the attorney's fee statute that was not in effect at the time that the divorce complaint was filed). Thus, in reviewing the trial court's denial of Wife's request for attorney's fees, we apply the version of the statute in effect at the time of the filing of the divorce complaint in 2018, which did not mandate consideration of the amount of the attorney's fees before deciding which party would be responsible for the fees. *See* Tenn. Code Ann. § 36-5-121(h)(1) (effective April 25, 2011 to March 30, 2022). Nevertheless, we will consider the amount of attorney's fees incurred because it is relevant to the extent that we must determine, inter alia, whether the disadvantaged party has sufficient funds to pay the fees incurred. *See Umstot*, 968 S.W.2d at 824; *see also Houghland*, 844 S.W.2d at 623.

As noted earlier, the trial court engaged in a detailed analysis of the statutory alimony factors in deciding to award Wife transitional alimony in the amount of $13,000 per month for eight years. Immediately thereafter, as the transcript from the hearing reveals, the trial court announced that it was awarding Wife alimony in solido in the amount of $229,000. Upon making that award, the court commented that it had awarded Wife "almost $2 million [in cash or close to cash] plus alimony for eight years." Then, immediately after making that acknowledgement, the court announced from the bench: "I'm going to make each side responsible for paying their own attorneys' fees and their own expert fees since I think there's adequate funds here for everybody to pay their own." Thus, it is readily apparent that the trial court's decision to award Wife liquid assets of approximately $2 million was a major factor in ordering that each party would pay his or her own attorney's fees and expert witness fees. As the trial court stated in its memorandum, "there are adequate funds here for each party to pay his/her own fees."

Nevertheless, Wife argues that the trial court erred in denying her request for attorney's fees because it did not consider whether her fees were reasonable and necessary in light of Husband's "legal maneuvering and obstructionist tactics." Wife also cites to Husband's ability to pay, her need, and Husband's fault in the demise of the marriage.

Although the trial court did not make an express finding that Husband or Wife engaged in legal maneuvering or obstructionist tactics, Wife fails to cite in her brief instances in the record upon which we could conclude that Husband engaged in such tactics, *see* Tenn. R. App. P. 27(a)(6), and it is not this court's responsibility to engage in such a search when a party fails to cite to the record. We, however, acknowledge that Husband's infidelity is the basis upon which Wife was granted a divorce from Husband. Nevertheless, this factor, standing alone, fails to carry the day in light of the other relevant factors that the trial court appropriately considered.

Although Wife's attorney's fees are significant, in excess of $400,000, she was awarded alimony in solido in the amount of $229,000 as well as marital assets of "$1.6 million [in] cash or close to cash" which she may use to pay her attorney's fees. Thus, Wife has sufficient funds to pay her legal expenses, *see Houghland*, 844 S.W.2d at 623, without being required to deplete her resources in order to pay them. *See Harwell*, 612 S.W.2d at 185. Accordingly, we affirm the trial court's discretionary decision requiring the parties to pay their own attorney's fees and expenses.

## IV. ATTORNEY'S FEES ON APPEAL

Wife requests her attorney's fees on appeal. Under Tennessee Code Annotated § 36-5-103(c), this Court has the discretion to award attorney's fees to a prevailing party. *Pippin v. Pippin*, 277 S.W.3d 398, 407 (Tenn. Ct. App. 2008). In exercising our discretion, we consider the requesting party's ability to pay such fees, the requesting party's success on appeal, whether the appeal was taken in good faith, and any relevant equitable factors. *Norman v. Norman*, No. M2015-02364-COA-R3-CV, 2017 WL 3705121, at *9 (Tenn. Ct. App. Aug. 28, 2017) (citation omitted). Considering all of the relevant factors in this case, we respectfully decline to award Wife her attorney's fees on appeal.

## IN CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court in all respects. Costs of this appeal are assessed against the appellant, Cassandra Burks.

_____
FRANK G. CLEMENT JR., P.J., M.S.